[No. E037906. Fourth Dist., Div. Two. July 27, 2006.]

ORTEGA ROCK QUARRY et al., Plaintiffs and Appellants, v.
GOLDEN EAGLE INSURANCE CORPORATION et al., Defendants and
Respondents.

COUNSEL

Thompson & Colegate, John A. Boyd and Susan Knock Brennecke for Plaintiffs and Appellants.

Koeller, Nebeker, Carlson & Haluck, William L. Haluck and Sonia Patel for Defendants and Respondents Golden Eagle Insurance Corporation and Liberty Mutual Insurance Company.

Colliau Elenius Murphy Carluccio Keener & Morrow and Jeffrey T. Woodruff for Defendants and Respondents Continental Casualty Company and Valley Forge Insurance Company.

OPINION

**HOLLENHORST, Acting P. J.—**

## I. INTRODUCTION

Plaintiffs and Appellants Ortega Rock Quarry, Jay Hubbs, and John Schmutz (sometimes referred to collectively as Ortega) appeal from judgment following the trial court's grant of summary judgment in favor of defendants and respondents Golden Eagle Insurance Corporation, Liberty Mutual Insurance Company, Continental Casualty Company, and Valley Forge Insurance Company (sometimes referred to collectively as the insurers). Ortega made

claims against the insurers for a defense and indemnity for an Environmental Protection Agency (EPA) order and corresponding civil lawsuit. The insurers relied on pollution exclusions in the policies to deny coverage, and Ortega brought a lawsuit for breach of contract and other claims. The trial court granted summary judgment and summary adjudication in favor of the insurers, and Ortega has appealed. Ortega contends that the trial court erred in determining that (1) the insurers had no duty to defend Ortega because the EPA proceedings were not a "suit" within the scope of the policies; (2) the pollution exclusion endorsements in the insurance policies excluded coverage for Ortega's claims; and (3) Ortega's acts were willful and therefore uninsurable.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. *Underlying Facts*

The underlying facts are essentially undisputed. Plaintiff and appellant Ortega Rock Quarry operated a rock quarry business in southern Orange County; Hubbs and Schmutz were principals of the corporation. Defendant Golden Eagle Insurance Company, a subsidiary of Liberty Mutual Insurance Company (collectively referred to as GEIC), had issued a general commercial liability policy and an excess insurance policy to Ortega with policy dates of February 1999 to February 2000. Ortega was also insured under a general commercial liability policy issued by Continental Casualty Company, provided through its company Valley Forge Insurance Company (collectively referred to as CNA), with policy dates of February 1998 to February 1999.

Lucas Canyon Creek, an intermittent water course, runs through the land that Ortega Rock Quarry leased for its business. The lessor of the property was the Santa Margarita Company. In February 1998, El Niño storms caused the creek to overflow and wash out an access road on the leased property. To maintain access to the quarry, Ortega placed fill dirt from the quarry along the road throughout 1998 and 1999.

### B. *EPA Administrative Orders*

The EPA issued an administrative order to Ortega in February 2000, alleging that Ortega's placement of fill along the road had resulted in an unauthorized discharge of fill material into Lucas Canyon Creek. The order required Ortega to:

"(1) Immediately cease discharge of fill material into Lucas Canyon Creek except as authorized by permit;

"(2) Submit an interim erosion control plan and site restoration plan;

"(3) Submit an interim erosion control plan to curtail erosion of the fill materials into the creek; and

"(4) Submit a restoration plan detailing the manner in which the impacted areas of the creek would be restored."

■ The order stated that on " 'numerous days in 1999,' " Ortega had, without a permit, discharged fill material, consisting of dirt and rocks, along the northern embankment of Lucas Canyon Creek, causing substantial portions of the creek to fill. The order alleged a violation of section 1311(a) of title 33 of the United States Code, which makes it unlawful to discharge any pollutant from a point source into any water of the United States without a permit. The order stated that the fill materials, consisting of dirt and rocks, that Ortega placed into the creek bed "are dredged and fill material, hence pollutants within the meaning of sections 301(a) and 404" of the Clean Water Act (33 U.S.C.A. § 1251 et seq.)

In response to the order, Ortega assisted in the development of a removal/restoration plan that was accepted by the EPA in June 2000. In October 2000, the EPA issued a second order to Ortega directing it to implement and complete, by December 15, 2000, remedial acts outlined in the removal/restoration plan.

### C. *Civil Lawsuit*

In June 2001, the Santa Margarita Company, Ortega's lessor, filed a civil lawsuit against Ortega alleging that Ortega had damaged the creek and surrounding property. The lawsuit sought damages and a judicial determination that Ortega owed the Santa Margarita Company indemnity for any property damage that was subject to the Clean Water Act.

### D. *Policy Provisions*

The insurers had issued general liability and excess coverage policies to Ortega.

### 1. Definition of "Suit"

Both the GEIC and CNA policies defined "suit" as follows: " 'Suit' means a civil proceeding in which damages because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies are alleged. 'Suit' includes: [¶] a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or [¶] b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent."

### 2. Pollution Exclusion Endorsements

The GEIC policy contained a pollution exclusion endorsement that excluded from coverage:

"1) 'Bodily injury,' 'property damage,' or 'personal injury' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

"2) Any loss, cost or expense arising out of any:

"a. Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of pollutants; or

"b. Claim or suit by or on behalf of any authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants; or

"c. Payment related to the investigation or defense for any loss, injury or damage, or any cost, fine or penalty, or for any expense or claim or suit related to 1) and 2) a. and b. above." The CNA policy included a substantially similar pollution exclusion endorsement.

Under both the GEIC and CNA policies, "pollutants" were defined as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

### E. Ortega's Submission of Claims to Insurers

Ortega submitted claims to the insurers to defend it in the EPA administrative proceedings and in the civil lawsuit. The insurers summarily denied both

claims, contending that coverage was barred under the pollution exclusions in the policies. The insurers also asserted that dirt and rocks were pollutants within the policy definitions and were thus subject to the pollution exclusion.

### F. *Ortega's Lawsuit*

Ortega filed suit against the insurers for breach of the insurance contracts and breach of the covenant of good faith and fair dealing and for a declaration that its claims were covered under the insurance policies.

CNA filed a motion for summary judgment and/or summary adjudication. GEIC filed a motion for summary adjudication as to issues of duty and damages.

Following additional briefing and a hearing, the trial court granted summary adjudication in favor of GEIC and summary judgment in favor of CNA. The court held that the policy language did not trigger a duty to defend an EPA action. The court further held that the pollution exclusions in the policies excluded coverage for Ortega's claims. Finally, the court held that Ortega's acts were willful and therefore uninsurable. Judgment was entered in favor of CNA, and GEIC stipulated to judgment with the proviso that the stipulated judgment did not waive Ortega's right to appeal and that appeals against all the insurers could proceed together.

## III. DISCUSSION

### A. *Standard of Review*

This court applies a de novo standard of review to an appeal based on the granting of summary judgment when, as here, the underlying facts are undisputed and the sole issues involve interpretation or application of the terms of an insurance policy. (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 414 [33 Cal.Rptr.3d 583, 118 P.3d 607].) In conducting our review, we apply settled rules governing the interpretation of an insurance policy:

■ " ' " 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citations.] 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citation.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] 'If contractual language is clear and explicit, it governs.' [Citation.]" [Citation.]

" ' " 'A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.' [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does '[d]isagreement concerning the meaning of a phrase,' or ' "the fact that a word or phrase isolated from its context is susceptible of more than one meaning." ' [Citation.] ' "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." ' [Citation.] 'If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' [Citation.]" [Citation.]' [Citation.]" (*County of San Diego v. Ace Property & Casualty Ins. Co.*, *supra*, 37 Cal.4th at p. 415.)

 Under California law, " ' "[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] . . . '[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy.' [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]" [Citation.]' [Citation.] [¶] To prevail . . . on the issue of duty to defend, the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential. 'In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*.' [Citation.]" (*Standun, Inc. v. Fireman's Fund Ins. Co.* (1998) 62 Cal.App.4th 882, 888–889 [73 Cal.Rptr.2d 116] (quoting *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295, 300 [24 Cal.Rptr.2d 467, 861 P.2d 1153].)

## B. *Determination That EPA Orders Were Not Suits*

 The trial court held that the insurers had no duty to defend because the EPA administrative proceedings were not "suits" within the meaning of the policies. When the EPA believes that an individual or entity has violated the Clean Water Act, the EPA may issue an administrative order to the alleged offender setting forth the EPA's claims. If the offender identified in the order does not comply with the EPA's demands, the EPA may file a civil lawsuit in federal district court.

Our Supreme Court has held that such administrative proceedings are not "suits" (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265] (*Foster-Gardner*)), and that

costs a company is required to pay as a result of such proceedings are not "damages" within the meaning of insurance policies (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945 [103 Cal.Rptr.2d 672, 16 P.3d 94] (*Powerine*)).

In *Foster-Gardner*, the Supreme Court held that the defendant insurers had no duty to defend the plaintiff insured in proceedings originating from a determination and order from a department of the California Environmental Protection Agency because those proceedings were not a "suit." The policies at issue required the insurers to "defend any suit against the insured seeking damages on account of . . . bodily injury or property damage, . . . and may make such investigation and settlement of any claim or suit . . . ." (*Foster-Gardner, supra*, 18 Cal.4th at p. 863.) The court held that the use of the word "suit" in the policies meant a civil action commenced by the filing of a complaint. (*Id.* at p. 887.) Thus, the court held, the department's order issued before the filing of a complaint did not initiate a suit within the meaning of the policies, and the insurers had no duty to defend. (*Id.* at pp. 887–888.)

Later, in *Powerine*, the Supreme Court expanded upon its holding in *Foster-Gardner* and held that "the insurer's duty to indemnify the insured for 'all sums that the insured becomes legally obligated to pay as damages' is limited to money ordered by a court." (*Powerine, supra*, 24 Cal.4th at pp. 951, 960, 964.) Thus, the court rejected the argument of the insureds that they were entitled to indemnity under a standard comprehensive general liability policy for costs incurred in complying with orders issued during administrative environmental proceedings because the administratively imposed liabilities did not constitute "money ordered by a court." (*Id.* at p. 966.)

In *Powerine*, the policy period in question was from 1958 to 1961. The court noted that the standard comprehensive general liability (CGL) policy was developed in 1940 and had evolved over the years. In 1986, the standard CGL policies defined a "suit" as a civil proceeding, but the policy before the court did not contain any definition of "suit." The court also noted that administrative proceedings such as those instituted by the EPA and state environmental agencies were not in existence at the time the *Powerine* policy was drafted; and finally, the policy's references to "suit" and "damages" indicated that "damages" were necessarily adjudged in a civil judicial proceeding. (*Powerine, supra*, 24 Cal.4th at pp. 955–956, 959, 960.) The court therefore held that indemnity coverage applied only to damages from a civil suit. (*Id.* at p. 960.)

The court noted, however, that its holding applied to the policy under consideration. The court stated, "The syllogism here is *not* predicated on any

assumption that the absence of a duty to defend *necessarily* entails the absence of a duty to indemnify *under some possible policy of comprehensive general liability insurance.* It is predicated, instead, on the fact that the absence of a duty to defend *actually* entails the absence of a duty to indemnify *under this individual policy of comprehensive general liability insurance.*" (*Powerine, supra,* 24 Cal.4th at p. 973, original italics.)

Ortega argues that *Foster-Gardner* and *Powerine* are distinguishable because in that case, the policies at issue did not contain a definition of the word "suit." (See *Foster-Gardner, supra,* 18 Cal.4th at p. 864; *Powerine, supra,* 24 Cal.4th at p. 959, fn. 3.) Thus, the courts were required to make an independent determination of the term based on common usage.

In contrast, in the present case, the policies did contain a definition of the word "suit" that included alternative dispute resolution. Specifically, the policies issued to Ortega defined a suit as "a civil proceeding in which damages because of . . . 'property damage,' . . . to which this insurance applies are alleged. 'Suit' includes: [¶] a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or [¶] b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent." Ortega contends that the general negotiations and exchange of letters between it and the EPA were "a form of alternative dispute resolution" within the coverage of the policies.

However, even if we were to accept Ortega's interpretation of the policies, Ortega has not cited any evidence that it requested or obtained the insurers' "consent" to submit to such proceedings. The policies' definition of alternative dispute resolution proceedings unambiguously covers only such proceedings "to which the insured submits with [the insurer's] consent." Thus, even accepting for purposes of argument that an EPA administrative proceeding might be a form of alternative dispute resolution, Ortega has not established that the EPA administrative proceeding was a "suit" within the meaning of the policies. Thus, the trial court did not err in determining that the insurers had no duty to defend Ortega in the EPA proceedings.

Our conclusion, however, does not extend to the insurers' duty to defend in the civil lawsuit filed by Santa Margarita. The trial court's order was silent on that issue. Thus, we turn to the trial court's next conclusion, that Ortega's activities were excluded from coverage under the total pollution exclusions in the policies.

## C. *Application of the Total Pollution Exclusion*

The trial court also held that the total pollution exclusions in the policies precluded coverage for Ortega's activities in placing dirt and rocks in the

creek bed. Ortega raises several related challenges to this holding. First, Ortega argues that the total pollution exclusion was ambiguous because it failed to adopt the definition of pollutants set forth in the Clean Water Act or to unambiguously exclude coverage for any proceeding under state and federal statutes under any definition of pollutant identified in those statutes. Second, Ortega challenges the trial court's reasoning that the fact that dirt and rocks occurred in nature did not mean they were not contaminants when dumped in a waterway. Finally, Ortega argues that under the doctrine of *ejusdem generis*, the use of the term "including" preceding a list of examples in the policies' definition of pollutants means that all pollutants must be of the same general class as the listed examples. Thus, Ortega contends, this doctrine suggests that the only "irritants" or "contaminants" that are excluded from coverage are those that are enumerated after the word "including," i.e., "smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Ortega argues that the language of the pollution exclusion was thus ambiguous, and under established principles, any ambiguity must be construed in favor of the insured.

### 1. *Failure to Incorporate Statutory Definitions of Pollution*

■ The Clean Water Act defines pollutants as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." (33 U.S.C.A. § 1362(6).) Ortega contends the total pollution exclusion was ambiguous because it failed to adopt the definition of pollutants as set forth in the Clean Water Act or to provide that coverage was excluded for any proceeding under state or federal statutes under any statutory definition of pollutants. Ortega notes that the Golden Eagle excess policy specifically excluded coverage " 'for which the Insured may be held liable under the "United States Longshoremen and Harbor Workers Act" and the "Jones Act," ' " and the policy could have stated an exclusion with the same clarity for claims arising under the Clean Water Act.

■ We conclude, however, that state and federal environmental laws may provide insight into the scope of the policies' definition of pollutants without being specifically incorporated in those definitions. (See, e.g., *Garamendi v. Golden Eagle Ins. Co.* (2005) 127 Cal.App.4th 480, 486 [25 Cal.Rptr.3d 642] (*Garamendi*) [referring to 29 C.F.R. § 1910.1000, which identifies silica dust as an "air contaminant" in denying coverage for workers' silica-related injuries]; see also *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 653 [3 Cal.Rptr.3d 228, 73 P.3d 1205] (*MacKinnon*) [stating that the pollution exclusion "was adopted to address the enormous potential liability resulting from antipollution laws enacted between 1966 and 1980"].) Thus, the fact

that the policies do not specifically incorporate statutory definitions does not make the language of the pollution exclusion ambiguous.

### 2. *Application of Pollution Exclusion to Natural Materials*

Ortega next challenges the trial court's statement that "the fact that dirt and rocks occur in nature does not mean that they are not contaminants when dumped in a waterway," contending that this statement is overbroad and unreasonable.

However, "natural" dirt and rocks are pollutants within the meaning of the Clean Water Act when placed in waters of the United States in violation of the Clean Water Act. (See *Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.* (2002) 295 A.D.2d 289, 290 [744 N.Y.S.2d 395] [stating that "The hazardous substances are not rendered non-polluting by the fact that they are naturally occurring [citation], since, in this case, the hazardous material 'is not found in its unaltered form because mining, an unnatural process, has altered its location' "]; see also *Space v. Farm Family Mut. Ins. Co.* (1997) 235 A.D.2d 797, 798 [652 N.Y.S.2d 357] [natural organic fertilizer may be a pollutant within the meaning of a pollution exclusion when it leaches into ground water or contaminates water sources].) Thus, the trial court's statement was not erroneous in the circumstances of the present case.

### 3. *Doctrine of Ejusdem Generis*

Ortega argues that under the doctrine of *ejusdem generis*, the use of the term "including" preceding the list of examples in the total pollution exclusion means that all pollutants must be of the same general class as the listed examples. Thus, Ortega contends, the only "irritants" or "contaminants" that are excluded from coverage are those that are enumerated after the word "including," i.e., "smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

Under the principle of *ejusdem generis*, "[p]articular expressions qualify those which are general." (Civ. Code, § 3534.) In an insurance policy, specific provisions rather than general provisions govern the insurance contract relating to a particular subject, even though the general provision, standing alone, would be broad enough to include the subject to which the more specific provision relates. (*Furtado v. Metropolitan Life Ins. Co.* (1976) 60 Cal.App.3d 17, 25 [131 Cal.Rptr. 250].)

We first observe that the term "including" preceding a list of examples is not always used as a term of limitation. (See, e.g., *People ex rel. San Francisco Bay Conservation etc. Com. v. Smith* (1994) 26 Cal.App.4th 113,

130 [31 Cal.Rptr.2d 488] ["We also agree with the Attorney General's observation that to use the doctrine of *ejusdem generis* as a *limitation* on [the term] 'structure' [as used in Gov. Code, § 66632], rather than an illustration of expansive reach, arguably cramps the overall context of language defining fill as 'earth *or any other substance or material, including* . . . structures floating . . . and moored for extended periods, such as houseboats and floating docks' [citation]"].)

"[T]he word 'including' in a statute is 'ordinarily a term of enlargement rather than limitation.' " (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 717 [3 Cal.Rptr.3d 623, 74 P.3d 726]; see *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639 [268 P.2d 723] ["The statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions"].)

We next note that courts in California and other jurisdictions have found no ambiguity in the language of total pollution exclusions identical or substantially similar to that in the policies we are presently considering. In *Garamendi, supra,* 127 Cal.App.4th 480, an insurer refused the tender of defense by its insured on claims based on workers' inhalation of silica dust arising from the insureds' sandblasting operations. The insurer argued that the total pollution exclusion endorsement in the policy (in language identical to that in the present case) precluded coverage for the claims. The trial court agreed, and the appellate court affirmed. (*Id.* at pp. 483–484.)

The foundation for the court's opinion in *Garamendi* was the Supreme Court's recent treatment of the interpretation of a total pollution exclusion in *MacKinnon, supra,* 31 Cal.4th 635. In *MacKinnon,* the court considered the meaning of an exclusionary clause in a comprehensive general liability policy that excluded injuries caused by the " 'discharge, dispersal, release or escape' " of pollutants. Specifically, the court was asked to determine whether that clause applied to exclude injury to a tenant resulting from the landlord's use of pesticides on his property. The court concluded that the clause did not apply. (*Id.* at p. 653.)

In doing so, the court noted that the passage of environmental laws over the past several decades had been the motivation for insurers to amend the pollution exclusion from qualified to absolute. The court stated, "[c]ommentators have pointed as well to the passage of [CERCLA] . . . in 1980 and the attendant expansion of liability for remediating hazardous wastes [citation] as motivation for amending the exclusion. '[T]he available evidence most strongly suggests that the absolute pollution exclusion was designed to serve the twin purposes of eliminating coverage for gradual environmental degradation and government-mandated cleanup such as Superfund response cost

reimbursement.' " (*MacKinnon, supra,* 31 Cal.4th at p. 645.) The court limited the scope of the pollution exclusion to "injuries arising from events commonly thought of as pollution, i.e., environmental pollution . . . ." (*Id.* at p. 653.)

The *Garamendi* court stated its interpretation of *MacKinnon* as follows:

"In [*MacKinnon*], our Supreme Court considered at length the derivation and interpretation of a pollution exclusion provision that defined pollution in essentially the same language as contained in claimant's Golden Eagle policy. Recognizing that the policy definition of a 'pollutant' as including 'any irritant or contaminant,' read literally, leads to 'absurd results and ignores the familiar connotations of the words used in the exclusion,' the court felt it ' "far more reasonable that a policyholder would understand [a pollutant] as being limited to irritants and contaminants *commonly thought of as pollution* and not as applying to every possible irritant or contaminant imaginable." ' [Citation.] The court therefore limited the scope of the pollution exclusion 'to injuries arising from events commonly thought of as pollution, i.e., environmental pollution.' [Citation.]

"Applying this standard, the court in *MacKinnon* held that a landlord's allegedly negligent use of a pesticide by spraying to eradicate yellow jackets around its apartment building did not come within the scope of the pollution exclusion" because such activity " 'would not comport with the common understanding of the word "pollute." ' [Citation.]" (*Garamendi, supra,* 127 Cal.App.4th at p. 485.)

Paralleling the argument Ortega raises in the present case, the insured in *Garamendi* argued that silica was not a pollutant within the meaning of the policy definition because it was not " 'smoke, vapor, soot, fumes, acid, alkalis, chemicals [or] waste,' " and it was found in many commonplace materials such as sand, glass, concrete, and computer chips. (*Garamendi, supra,* 127 Cal.App.4th at p. 485.) The court rejected this argument, explaining, "But even if silica is not one of the enumerated items listed in the policy definition of pollutants, *that listing is not exclusive* and silica dust nonetheless comes within the broad definition of 'any solid, liquid, gaseous, or thermal irritant or contaminant.' " (*Id.* at pp. 485–486, italics added.) Thus, the court impliedly rejected the application of the *ejusdem generis* doctrine to the definition of pollution within the total pollution exclusion.

Courts in other jurisdictions have reached similar conclusions. In *Pa. Nat. Mut. Cas. Ins. v. Triangle Paving,* (E.D.N.C. 1996) 973 F.Supp. 560 (*Triangle Paving*), the court held that sedimentation from runoff at a construction site

was a pollutant within the meaning of the pollution exclusion in insurance policies. The pollution exclusion in those policies was substantially similar to those we consider in the present case. (*Id.* at p. 561.)

During construction activity, the defendant dislodged sediment that escaped from the construction site and contaminated downstream water sources on private property. The city where the construction was taking place issued notices of violation and directed the defendant to correct the problem, and the owner of water sources contaminated by the sediment complained to the defendant. The defendant's insurer settled the property owners' claims and then filed suit against the defendant seeking reimbursement. The defendant requested the plaintiff to defend and indemnify against the claim, and the plaintiff brought an action for a declaratory judgment to determine whether the underlying activity fell within the pollution exclusion. (*Triangle Paving, supra*, 973 F.Supp. at p. 562.)

The plaintiff insurer argued that "the inclusion of the explanatory term 'solid . . . contaminant' in the definition of pollutant encompasses the act of sedimentation," and that "sedimentation contamination [fell] squarely within the plain language of the pollution exclusion." In contrast, the defendant insured argued that "the enumerated list in the definition serves to limit pollutants to the specified examples." Thus, the defendant argued, the court should restrict the definition to " 'smoke, vapor, soot, fumes, acid, alkalis, chemicals or waste' and possibly other related industrial or man-made materials." (*Triangle Paving, supra*, 973 F.Supp. at p. 563.)

The court noted that under North Carolina law (as under California law), any ambiguities in an insurance contract must be construed in favor of the insured. (*Triangle Paving, supra*, 973 F.Supp. at p. 563.) The court concluded, however, that the definition of pollutants was not ambiguous. The court explained that "defendant disregards the controlling term that precedes the list of examples. The definition clearly states that pollutants shall consist of 'any solid, liquid, gaseous, or thermal irritant or contaminant *including* smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste[]' (emphasis added). In context, the term 'including' clearly signifies that the ensuing list is not one of limitation." (*Ibid.*)

The defendant also argued that references to statutes or local ordinances were unrelated to the scope of the term "pollutant" as used in the insurance policies. The court rejected this argument, explaining, "Again, the standard in this case is how a reasonable person in the position of the insured would interpret the contract. The court does not interpret policy provisions in a vacuum but, instead, must give the common meaning to disputed terms. A

review of the extensive state and local commentary on the topic helps to supply the common meaning or understanding." (*Triangle Paving, supra,* 973 F.Supp. at p. 565.)

The court concluded, "In a case such as this, where an insurer seeks to trigger a coverage exemption with respect to a matter of first impression, the court is cautious of relieving the insurer of duties for which the insured may have already paid. Notwithstanding, the particular facts giving rise to this dispute persuade that, even under close scrutiny, the pollution exclusion *is* applicable. The plain language of the policy in conjunction with the regulatory backdrop compels a finding for plaintiff. Defendant has failed to offer any concrete evidence rebutting plaintiff's representations about the common categorization of sedimentation. Without contrary evidence, when the North Carolina Legislature has spoken with such unequivocal clarity, the court must follow its guidance. Because no genuine issue of material fact exists, summary judgment is appropriate." (*Triangle Paving, supra,* 973 F.Supp. at pp. 566–567.) The court therefore held that "the term 'pollutant' as it is used in plaintiff's insurance policies includes sedimentation and, thus, plaintiff is under no obligation to defend or indemnify defendant for claims arising from sedimentation caused during the [construction] project," and the court granted the plaintiff's motion for summary judgment. (*Id.* at p. 567.)

Other courts, considering the language of the total pollution exclusion under facts analogous to those before us, have likewise interpreted the total pollution exclusion in the same manner as the court in *Triangle Paving.* (See *Monarch Greenback, LLC v. Monticello Ins. Co.* (D.Idaho 1999) 118 F.Supp.2d 1068, 1070, fn. 1 & 1079–1080 [holding that mine tailings consisting of sand, silt, clay, and trace metals were pollutants within the meaning of an insurance policy pollution exclusion substantially similar to that at issue in the present case and that the pollution exclusion was not ambiguous]; *Clarendon America Ins. Co. v. Bay, Inc.* (S.D.Tex. 1998) 10 F.Supp.2d 736, 743–744 [holding that sand and gravel, among other substances, were pollutants within the meaning of an insurance policy pollution exclusion substantially similar to that at issue in the present case, and that the pollution exclusion was not ambiguous]; *Guilford Industries, Inc. v. Liberty Mut. Ins. Co.* (D.Me. 1988) 688 F.Supp. 792, 794–795, affd. (1st Cir. 1989) 879 F.2d 853) ["[The total pollution exclusion] defines pollutant quite clearly as *any* solid, liquid, gaseous or thermal irritant or contaminant and then gives examples. The doctrine of *ejusdem generis* does not apply when the context demonstrates a contrary intention, [citation], and the intention that damages caused by discharged of *any* irritant or contaminant be

excluded is manifest"]; *Landshire Fast Foods v. Employers Mut. Cas. Co.* (2004) 2004 WIApp 29 [269 Wis.2d 775, 783, 676 N.W.2d 528, 532] [holding that the total pollution exclusion precluded coverage for bacterial contamination and rejecting the use of the *ejusdem generis* doctrine to limit the definition of pollution].)

In one unpublished federal case, however, on which Ortega relies, the court reached an opposite conclusion. (*Tsakopoulos v. American Manufacturers Mut. Ins. Co.* (E.D.Cal. Aug. 9, 2000, No. Civ. S990853 GEB JFM) 2003 WL 22595248 (*Tsakopoulos*).[1] In *Tsakopoulos*, the plaintiff insured sued his insurers for breach of contract and breach of the implied covenant of good faith and fair dealing based on the insurers' declining to defend him in litigation with the EPA or to indemnify him for a portion of the judgment entered in that litigation. (*Tsakopoulos*, at p. *1.) Between 1993 and 1997, the plaintiff had caused extensive plowing to be done at his ranch to convert the land for use as vineyards. In 1997, he initiated a federal civil action against the EPA and others seeking a declaratory judgment that he was not required to obtain permits under the Clean Water Act to engage in plowing activities at the ranch. The EPA asserted a counterclaim alleging that his prior plowing operations had violated the Clean Water Act by causing dredged or fill material to be discharged into waters of the United States. Specifically, the EPA alleged "that the soil discharged into jurisdictional waters as a result of Tsakopoulos's plowing constituted a 'pollutant' " within the meaning of the Clean Water Act. (*Tsakopoulos*, at p. *1.)

Tsakopoulos tendered defense of the counterclaim to its comprehensive general liability insurers and excess coverage insurers. One insurer accepted tender of the defense subject to a reservation of rights; the other insurers declined to defend the action on the grounds that their policies excluded coverage for pollution damages, and the counterclaim sought civil penalties and injunctive relief that were not covered under the policies. (*Tsakopoulos, supra,* 2003 WL 22595248 at p. *1.)

At a bench trial on the counterclaim, the court found that Tsakopoulos's plowing operations had resulted in numerous violations of the Clean Water Act. Tsakopoulos was fined $1.5 million, but the court held that $1 million of the fine would be held in abeyance if Tsakopoulos consented to injunctive relief requiring him to remedy the violations in cooperation with the government. Tsakopoulos agreed to undertake the restoration, and the judgment incorporated a restorative injunction. (*Tsakopoulos, supra,* 2003 WL 22595248 at p. *2.)

---

[1] The insurers question Ortega's citation to and reliance on an unpublished case. California Rules of Court, rule 977, prohibits citation of unpublished opinions of California's appellate courts; however, it does not prohibit citation of unpublished federal opinions. (*Discover Bank v. Superior Court* (2005) 134 Cal.App.4th 886, 892, fn. 2 [36 Cal.Rptr.3d 456].)

Tsakopoulos sought a declaration that each insurer was obligated to defend him on the counterclaim. The insurers argued that they had no such duty to defend because, among other things, "the alleged discharges did not constitute an 'occurrence' within the meaning of the policies," and "the Counterclaim arose out of damage caused by 'pollutants' within the meaning of the 'total pollution exclusions' in the policies." (*Tsakopoulos, supra*, 2003 WL 22595248 at p. *3.)

The defendants argued that the "total pollution exclusion" in each policy excluded the insurers' liability for the damages Tsakopoulos caused to waters of the United States. The court noted that "this exclusion applies only to damages caused by 'pollutants,' a term which is defined in each policy as 'any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.' " The court held that the term "pollutants" was ambiguous in the context of the case, and therefore, under California law, the insurance contract should be construed strictly against the insurer and liberally in favor of the insured. (*Tsakopoulos, supra*, 2003 WL 22595248 at p. *5.)

The court explained, "As noted, a substance must be a 'contaminant' or an 'irritant' to be a 'pollutant' within the meaning of the policies. Webster's Third New International Dictionary (1986) ('Webster's') defines a contaminant as 'something that contaminates'; to 'contaminate' means 'to soil, stain, corrupt, or infect by contact or association' or 'make inferior or impure by mixture,' or 'to render unfit for use by introduction of unwholesome or undesirable elements.' Webster's at 491. An 'irritant' is 'something that irritates or excites,' and to 'irritate' means 'to increase the action of' or 'heighten excitement in' something. [Citation.] Soil discharged into previously-unspoiled waters of the United States might constitute a 'contaminant' or an 'irritant' if those terms were to be construed liberally. However, the definition of 'pollutants' in each policy sets forth specific examples of contaminants and/or irritants: 'smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.' According to the principle of *ejusdem generis,* the proper construction of the term 'pollutant' is therefore 'restricted' to contaminants and irritants which are 'of the same kind, class, or nature' as the specific examples listed. [Citations.] Defendants argue that the use of the word 'including' before the specific examples means that the definition of 'pollutants' should not be limited to substances which are similar to the specified examples. However, the use of the word 'including' does not affect the application of the *ejusdem generis* doctrine. *County of Yolo v. Los Rios Community College Dist.,* 5 Cal.App.4th 1242, 1254 [7 Cal.Rptr.2d 647]

(1992) (holding that the term 'include, but need not be limited to' does not preclude the application of the *ejusdem generis* principle)." (*Tsakopoulos, supra*, 2003 WL 22595248 at p. *6, fns. omitted.)

The court noted that although a California court had held that the absolute pollution exclusion was unambiguous, that holding arose in a different context (*Tsakopoulos, supra*, 2003 WL 22595248 at p. *6, citing *Titan Corp. v. Aetna Casualty & Surety Co.* (1994) 22 Cal.App.4th 457, 469–70 [27 Cal.Rptr.2d 476] [finding that trichloroethylene was a " 'pollutant' "]), and "insurance policy provisions 'can, of course, be ambiguous in one context and not another.' *Continental Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 652 [593 N.Y.S.2d 966, 609 N.E.2d 506 (1993)] (noting that the pollution exclusion has been held to be unambiguous in covering discharges of 'acids, alkalis and toxic chemicals,' but ambiguous as to discharges of 'natural materials') (citing *Hicks v. American Resources Ins. Co.*, 544 So.2d 952, 953 (Ala. 1989), and *Molton, Allen & Williams v. St. Paul Fire & Marine Ins. Co.*, 347 So.2d 95, 99 (Ala.1977) ('*Molton*')); *accord Sterling Builders, Inc. v. United Nat'l Ins. Co.*, 79 Cal.App.4th 105, 112, 93 Cal.Rptr.2d 697 (2000) ('Contract terms are not ambiguous in a vacuum; they must be examined in context.') . . . ." (*Tsakopoulos, supra*, 2003 WL 22595248 at p. *6.)

The *Tsakopoulos* court found *Molton, supra*, 347 So.2d 95, persuasive on the issue of the ambiguity of the pollution exclusion. The court described *Molton* as follows: "In *Molton*, the insured was a developer who was constructing roads in a new development situated uphill from neighboring parcels. [Citation.] After the roadways were cleared and cut, but before they were paved, rainfall washed over the roadways and carried 'sandstone and sandstone-type materials found naturally in the earth,' which the rainwater had broken down into sand, onto the neighboring parcels, damaging them. [Citation.] The Court rejected the insurer's argument that a pollution exclusion substantially similar to the ones in this case eliminated coverage for the damage to the neighboring parcels, stating: '[W]hile a liberal construction of the "pollution exclusion" would include the damage allegedly caused by [the insured], the clause is not free from ambiguity. It is believed that the intent of the "pollution exclusion" clause was to eliminate coverage for damages arising out of pollution or contamination by industry-related activities. *The use of specific industry-related irritants, contaminants and pollutants seem to indicate this was the reason for the exclusion.* . . . [T]he clause here is ambiguous.' [Citation.]" (*Tsakopoulos, supra*, 2003 WL 22595248 at pp. *6–*7.)

The defendants argued that California courts have rejected the notion that the pollution exclusion is limited to hazardous or toxic materials and suggested that the *Molton* court had found an ambiguity based upon a finding that the sand in that case was not hazardous. The court found that this argument was based on a misreading of *Molton*, in which the court had found that the pollution exclusion was ambiguous in the context of sand, given the specific examples of " 'irritants, contaminants or pollutants' listed in the policy." (*Tsakopoulos, supra*, 2003 WL 22595248 at p. *7.)

The *Tsakopoulos* court also distinguished *Triangle Paving, supra*, 973 F.Supp. 560. The court stated: "However, Defendants have not shown that *Triangle Paving* is persuasive guidance for interpreting the exclusion clauses in this case. First, the district court in that case rejected the argument that 'the enumerated list in the definition serves to limit pollutants to the specified examples,' and held that, '[i]n context, the term "including" clearly signifies that the ensuing list [of specified pollutants] is not one of limitation.' [Citation.] But under California law, the doctrine of *ejusdem generis* calls for a contrary analysis of the policies in this case. [Citations.] The district court in *Triangle Paving* also noted that North Carolina's Sedimentation Pollution Control Act expressed the State legislature's finding that '[t]he sedimentation of streams, lakes and other waters of this State constitutes a major pollution problem.' [Citation.] Accordingly, the district court concluded that 'the statutory scheme offers uncontroverted evidence of how sedimentation is perceived and treated in the very profession in which defendant is engaged.' [Citation.]" (*Tsakopoulos, supra*, 2003 WL 22595248 at p. *7.)

The *Tsakopoulos* court acknowledged that, similarly, the definition of pollutants under the Clean Water Act included soil discharged during plowing. The court stated, however, that "under California law, the determination whether a clause is ambiguous depends upon whether a clause is subject to two or more reasonable interpretations; a court must look to the provision's 'plain meaning or the meaning a layperson would ordinarily attach to it.' [Citations.]" (*Tsakopoulos, supra*, 2003 WL 22595248 at p. *7.) The court concluded that "[s]ince the definition of 'pollutants' contained in each of the relevant policies is reasonably construed either to include soil discharged into waters of the United States or to exclude such material, that term is ambiguous under the circumstances of this case. Neither construction would be 'tortuous,' [citation]; 'strange,' [citation]; or 'absurd,' [citation]; each would be reasonable. While soil could arguably be an 'irritant' or a 'contaminant' when discharged into previously-unspoiled waters, the list of specified examples of pollutants which follows these terms restricts their construction. Since soil is not apparently of 'the same kind, class, or nature,' [citation], as 'smoke, vapor, soot, fumes, acids, alkalis, chemicals [or] waste,' the definition of pollutant does not unambiguously cover soil." (*Tsakopoulos, supra*, 2003 WL 22595248 at p. *8.)

The court concluded that because, under California law, an ambiguity in an insurance policy must be interpreted in favor of the insured, the total pollution exclusion did not preclude coverage under the general liability policy. Thus, because the insured had shown that a potential for coverage existed as to damages sought by the counterclaim, the general liability insurers owed him a duty to defend on the counterclaim, and their failure to defend him after he tendered the defense was a breach of the insurance contract. (*Tsakopoulos, supra,* 2003 WL 22595248 at p. *9.)

We do not find *Tsakopoulos* persuasive on the issue whether the definition of pollution in the total pollution exclusion was ambiguous. First, it was decided before *MacKinnon* and *Garamendi* and therefore did not analyze the policies at issue in light of the principles set forth in those cases. Second, its conclusion that the definition of pollution was ambiguous is at odds with the conclusions of numerous other courts in the cases cited above that have considered the issue under facts analogous to those presently before us. We conclude that the pollution exclusion was not ambiguous, and the trial court properly ruled that it excluded coverage for Ortega's activities.

D. *Determination That Ortega's Conduct Was Willful and Therefore Uninsurable*

■ The trial court ruled that Ortega's conduct was willful, and therefore uninsurable. Under Insurance Code section 533, a willful act is not insurable. A willful act may be either (1) an act done with intent to injure, i.e., an act deliberately done for the express purpose of causing damage or intentionally performed with knowledge that damages were highly probable or substantially certain to result, or (2) an act inherently harmful, i.e., an intentional wrongful act in which the harm is inherent in the act itself. (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 500 [78 Cal.Rptr.2d 142].) Ortega challenges this ruling.

■ Because we have concluded that the total pollution exclusion precluded coverage for Ortega's activities, and that conclusion is dispositive as to all Ortega's underlying claims, we need not address this additional basis for the trial court's ruling.

## IV. DISPOSITION

The judgment is affirmed.

McKinster, J., and Gaut, J., concurred.