**MIDWEST FAMILY MUTUAL INSURANCE COMPANY,**
**Respondent,**

v.

**Michael D. WOLTERS, et al., Respondents,**

**Charles E. Bartz, et al., Appellants,**

**Jerry D. Larson, Defendant.**

**No. A11–0181.**

Supreme Court of Minnesota.

May 31, 2013.

Steven E. Tomsche, Matthew R. Smith, Tomsche, Sonnesyn & Tomsche, P.A., Minneapolis, MN, for respondent Midwest Family Mutual Insurance Company.

Robert A. Woodke, Bruce L. Meyer, Brouse, Woodke & Meyer, PLLP, Bemidji, MN, for respondents Michael D. Wolters, et al.

Anthony J. Nemo, Meshbesher & Spence, Ltd., Minneapolis, MN, for appellants.

Laura Hanson, Damon L. Highly, Meagher & Geer, P.L.L.P., Minneapolis, MN; and Laura A. Foggan, Joshua A. Minix, Wiley Rein LLP, Washington, DC, for amicus curiae, Complex Insurance Claims Litigation Association.

## OPINION

ANDERSON, G. BARRY, Justice.

This case presents the issue of whether the absolute pollution exclusion found in the general liability insurance policy at issue here is limited to traditional environmental pollutants or whether the exclusion encompasses carbon monoxide released in a home by a negligently installed boiler. The district court denied Midwest Family Mutual Insurance Company's motion for summary judgment, holding that it would be "inappropriate to rule as a matter of law" that the "absolute pollution exclusion bars coverage under the facts in this case," since respondent Michael D. Wolters, the

general contractor and named insured, did not "cause any environmental pollution." In reversing the district court's decision, the Minnesota Court of Appeals noted that Minnesota courts have taken a " 'non-technical, plain-meaning approach' " to interpreting the pollution exclusion and held that under this approach, "carbon monoxide constitutes a pollutant" in the Midwest Policy. *Midwest Family Mut. Ins. Co. v. Wolters,* No. A11–181, 2011 WL 3654498, at *3 (Minn.App. Aug. 22, 2011) (quoting *Auto–Owners Ins. Co. v. Hanson,* 588 N.W.2d 777, 779 (Minn.App.1999)).

We affirm.

*Background*

In January 2007 appellant Charles E. Bartz hired respondent Wolters as the general contractor to build a seasonal residence on Bartz's property near Pennington, Minnesota. Wolters purchased a general liability insurance policy from Midwest ("Midwest policy") that included an absolute pollution exclusion. During construction, Bartz requested that Wolters install an in-floor radiant heating system. This system operates by running heated propylene glycol from a boiler through tubing installed within the concrete floor of the home. Wolters selected Mike's Heating, Inc., to supply the materials for the in-floor radiant heating system. Wolters claims he specified to the Mike's Heating salesman that the boiler purchased must accept propane fuel, and Wolters ultimately purchased a Munchkin boiler manufactured by Radiant Heat Products, LLC.

But the Munchkin boiler purchased by Wolters was designed to run on natural gas only. This is confirmed by photographs of the actual boiler installed in the Bartz home, bearing a large label warning "THIS APPLIANCE SET UP FOR NATURAL GAS ONLY." Wolters hired defendant Jerry D. Larson to install the boiler, which Larson did, but Wolters personally connected the boiler to a liquid propane line, despite the warning label.

Wolters directed an electrical subcontractor to install carbon monoxide detectors in the Bartz residence. After the detectors were installed by the electrical subcontractor, Wolters claims he tested the detectors and determined that they were operational. But evidence suggests that the detector had not been connected to the AC power source and the 9–volt back-up battery was installed backwards.

In the early morning hours of December 29, 2007, appellant Catherine M. Brewster awoke feeling dazed, disoriented, and nauseous. She tried to wake Bartz, but he was unresponsive. Brewster left the bedroom and tried to open the back door to get fresh air into the home, but her head slammed into the sliding glass door. She fell to the floor with a deep laceration on the bridge of her nose. Brewster stumbled around the kitchen, found a telephone, and called 911.

Shortly thereafter, the Beltrami County Sheriff, Cass Lake Fire Department, and a Cass Lake ambulance arrived at the Bartz home. Both Bartz and Brewster were transported to North Country Regional Hospital. The Fire Department determined that the source of the carbon monoxide was the Munchkin boiler.

*The Midwest Policy*

The Midwest policy contains the following absolute pollution exclusion:

9. **We** do not pay for **bodily injury *or* property damage:**

    a. arising wholly or partially out of the actual, alleged or threatened discharge, dispersal, release or escape of **pollutants:** . . .

    4) at or from any premises where **you** or any contractor or subcontractor, directly or indirectly under **your**

control, are working or have completed work:

a) if the **pollutant** is on the premises in connection with such work, unless the **bodily injury** or **property damages** arise from the heat, smoke or fumes of a fire which becomes uncontrollable or breaks out from where it was intended to be; or

b) if the work in any way involves testing, monitoring, clean-up, containing, treating or removal of **pollutants**.

In addition, the Midwest Policy defines "pollutants" in the following manner:

5. **Pollutants**—This means:

a. any solid, liquid, gaseous, thermal, electrical emission (visible or invisible) or sound emission pollutant, irritant or contaminant; or

b. waste, including materials to be recycled, reclaimed or reconditioned as well as disposed of.

*Litigation*

Appellants brought litigation against Wolters, alleging negligence in the installation of the boiler and carbon monoxide detectors and breach of express and implied warranties. Midwest appointed defense counsel to represent Wolters in the negligence actions subject to a reservation of rights and initiated a declaratory judgment action, requesting that the district court find that Midwest had no duty to defend or indemnify Wolters for the claims asserted in appellants' lawsuits because coverage was barred under the absolute pollution exclusion.

After a brief period of discovery, Midwest sought summary judgment. The district court denied Midwest's motion, holding that it would be "inappropriate to rule as a matter of law" that the "absolute pollution exclusion bars coverage under the facts in this case," since Wolters did not "cause any environmental pollution." The court subsequently entered final judgment against Midwest, ordering that Midwest had a duty to defend or indemnify Wolters.

Midwest appealed, and the court of appeals reversed, noting that Minnesota courts have taken a " 'non-technical, plain-meaning approach' to interpreting the pollution exclusion" and holding that under this approach, "carbon monoxide constitutes a pollutant" under the Midwest policy. *Wolters,* 2011 WL 3654498, at *3 (quoting *Hanson,* 588 N.W.2d at 779). The court stated that while the concerns expressed by appellants appeared "valid, precedent compels an interpretation of the pollution exclusion to include interior pollutants, and any policy-based expansion of that exclusion is beyond our authority." *Id.*

On appeal, appellants urge us to follow the majority rule and hold that absolute pollution exclusion clauses are limited to hazards traditionally associated with environmental pollution. Specifically, appellants argue that: (1) the "irritant or contaminant" language of the absolute pollution exclusion clause is ambiguous and must be interpreted in favor of the insured; and (2) a reasonable policyholder in Wolters' position would not have understood the absolute pollution exclusion to preclude coverage in this circumstance.

I.

Midwest claims that appellants waived their claim that the definition of "pollutants" in the Midwest policy is ambiguous by failing to raise this issue at either the district court or the court of appeals and, in fact, conceding that the plain meaning of the Midwest policy includes carbon monox-

ide within the definition of "pollutants." Midwest also claims that appellants waived their argument, by failing to raise the issue at the district court, the court of appeals, or in their petition for review,[1] that a reasonable policyholder would not consider carbon monoxide to be a pollutant within the context of this case because to do so would violate the "expectations" of the insured. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988) (holding that a reviewing court "must generally consider only those issues that the record shows were presented and considered by the trial court in deciding the matter before it") (internal quotation marks omitted). Because we conclude that appellants' argument that the definition of "pollutants" is ambiguous was fully litigated at both the district court and court of appeals, we hold that the argument is properly before us. We also conclude that it is in the interest of justice for us to consider appellants' argument regarding "reasonable expectations."

## A.

■ Appellants argue that the ambiguity of "pollutants" was a "key aspect of Appellants' arguments in both the district court and in the [c]ourt of [a]ppeals." Appellants' briefs to the district court and the court of appeals each contained an entire section devoted to the topic of the ambiguity of the exclusion, entitled:

"The Commercial General Liability Policy Pollution Exclusion is Ambiguous and Therefore Must be Construed in Favor of the Insured"

But at the district court and the court of appeals, appellants argued that the phrase "if the pollutant is on the premises in connection with such work" was ambiguous and subject to at least two possible interpretations: (1) any pollution caused by any work on the property falls within the exclusion; and (2) the pollutant must be brought onto the premises by the contractor during the work in order to fall within the exclusion. This argument is different from the ambiguity argument that appellants make here. Appellants argue to our court that the term "irritant" in the absolute pollution exclusion is ambiguous: since something that irritates or excites one person may generate no reaction in another, the term "irritant" necessarily can have more than one meaning in the context of exposure to a substance, depending on how the subject reacts to the substance. Generally, a party may not "obtain review by raising the same general issue litigated below but under a different theory." *Thiele,* 425 N.W.2d at 582.

But appellants' failure to raise the specific argument regarding the ambiguity of "pollutants" at the district court does not mean that the issue was not fully litigated. The record shows that both the district court and the court of appeals considered the issue of whether the meaning of "pollutants" was ambiguous when making their decisions. At the district court, Midwest argued that the pollution exclusion was unambiguous and applied to indoor carbon monoxide. In its decision denying summary judgment to Midwest, the district court noted that Minnesota courts have applied a "non-technical, plain-meaning ap-

---

**1.** On January 13, 2012, Midwest filed a motion to strike in an effort to prevent appellants from arguing about the ambiguity of the term "pollutant," and about the "reasonable expectations" of Wolters. On January 23, 2012, appellants filed and served a response to this motion. Shortly thereafter, we issued an or-

der deferring consideration of Midwest's motion to strike portions of appellants' brief until consideration of the appeal on the merits, and denying the motion to prohibit appellants from making certain arguments at oral argument. For the reasons explained below, we now deny the motion to strike.

proach to interpreting a pollution exclusion," (internal quotation marks omitted), but held that "public policy" did not support the exclusion of coverage in this case. The court of appeals determined that the absolute pollution exclusion was unambiguous and encompassed indoor carbon monoxide:

> We have taken a "non-technical, plain-meaning approach" to interpreting the pollution exclusion. Under this approach, carbon monoxide constitutes a pollutant under the policy definition. The definition includes "any . . . gaseous . . . emission . . . pollutant, irritant or contaminant." Carbon monoxide is a highly poisonous gas that was emitted by the improperly functioning boiler.

*Wolters,* 2011 WL 3654498, at *3 (omissions in original). Because the argument regarding the ambiguity of "pollutants" was fully litigated in both the district court and the court of appeals, it is properly before our court.

Contrary to Midwest's contention, appellants did not concede that carbon monoxide is unambiguously a "pollutant." Instead, appellants acknowledged in their brief to the court of appeals that "under the current non-technical, plain meaning approach, carbon monoxide would be considered a pollutant." As was made clear at the court of appeals and now here, appellants disagree with the court of appeals' approach in applying the non-technical, plain-meaning interpretation of the absolute pollution exclusion, and argue that the plain-meaning interpretation employed by Minnesota " 'creates a pollution exclusion with almost no limitation.' " *Continental Cas. Co. v. Advance Terrazzo & Tile Co.,* No. Civ. 03–5446MJDJSM, 2005 WL 1923661, at *6 (D.Minn. Aug. 11, 2005). Appellants argue that under the majority view, the term "pollutant" in the Midwest policy would be deemed ambiguous and

the language of the exclusion would be construed against Midwest.

## B.

■ Regarding Midwest's claim that appellants waived the right to assert their "reasonable expectations" of the insured argument, appellants respond that Midwest confuses the "reasonable expectations" doctrine with the principle that insurance contracts must be construed in accordance with an insured's "reasonable understanding":

> Appellant is arguing that a reasonable person standing in Wolters' shoes would have understood that the pollution exclusion at issue would not preclude coverage in this circumstance—not that Wolters' reasonable expectations were frustrated because the pollution exclusion was hidden.

Appellants' argument has merit. As we have instructed on several occasions:

> Provisions in an insurance policy are to be interpreted according to both plain, ordinary sense and what a reasonable person in the position of the insured would have understood the words to mean.

*Farmers Home Mut. Ins. Co. v. Lill,* 332 N.W.2d 635, 637 (Minn.1983) (citation omitted) (internal quotation marks omitted). At both the district court and the court of appeals, appellants cited this standard for insurance policy interpretation and therefore did not waive their "reasonable understanding" of the insured argument.

But in their brief to our court, appellants also raise a "reasonable expectations argument," which they did not raise at either the district court or the court of appeals. Appellants state, "a reasonable policy holder would not understand the policy to exclude coverage for anything that irritates," and cite to case law apply-

ing the "reasonable expectations" doctrine. *See Reg'l Bank of Colo. v. St. Paul Fire and Marine Ins. Co.,* 35 F.3d 494, 497 (10th Cir.1994); *Stoney Run Co. v. Prudential–LMI Commercial Ins. Co.,* 47 F.3d 34, 37 (2d Cir.1995). Although appellants failed to raise the "reasonable expectations" doctrine at the district court and the court of appeals, we may still consider the argument in the "interest of justice" pursuant to Minn. R. Civ.App. P. 103.04. Since we must decide whether to follow the majority or minority interpretation of the absolute pollution exclusion, and the "reasonable expectations" doctrine is critical to the reasoning of some jurisdictions constituting the majority view; it is in the interest of justice to consider appellants' arguments regarding "reasonable expectations."

Because we conclude that appellants' argument that the meaning of "pollutants" was ambiguous was litigated at both the district court and the court of appeals, we hold that the argument is properly before us. We also conclude that it is in the interest of justice for us to consider appellants' argument regarding "reasonable expectations."

## II.

The primary issue presented in this case is whether the absolute pollution exclusion in the Midwest policy encompasses carbon monoxide released in a home by a negligently installed boiler. The absolute pollution exclusion clause has been the subject of conflicting judicial decisions across the country. *See Porterfield v. Audubon Indem. Co.,* 856 So.2d 789, 800 (Ala.2002) ("[T]here exists not just a split of authority, but an absolute fragmentation of au-

thority."). Although we have considered the scope of a qualified pollution exclusion in *Board of Regents of the University of Minnesota v. Royal Insurance Company of America,* 517 N.W.2d 888, 891–93 (Minn.1994), we have never addressed the scope of the absolute pollution exclusion.

As the district court and the court of appeals recognized earlier in this litigation, a majority of jurisdictions limit the exclusion to situations involving traditional environmental pollution.[2] *See* 22 Britton D. Weimer et al., *Minnesota Practice—Insurance Law and Practice* § 12.21 (2d ed.2010); *see, e.g., Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., Ltd.,* 132 F.3d 526, 530–31 (9th Cir.1997) (applying Montana law); *Bituminous Cas. Corp. v. Advanced Adhesive Tech., Inc.,* 73 F.3d 335, 339 (11th Cir.1996) (applying Georgia law); *Reg'l Bank of Colo.,* 35 F.3d at 498 (applying Colorado law); *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,* 976 F.2d 1037, 1042–44 (7th Cir.1992) (applying Illinois law); *Westchester Fire Ins. Co. v. City of Pittsburg, Kan.,* 768 F.Supp. 1463, 1468–70 (D.Kan.1991); *Porterfield,* 856 So.2d at 805–07 (applying Alabama law); *Keggi v. Northbrook Prop. & Cas. Ins. Co.,* 199 Ariz. 43, 13 P.3d 785, 790–92 (App.2000); *Am. States Ins. Co. v. Koloms,* 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 77–82 (1997).

A minority of jurisdictions apply the absolute pollution exclusion literally, finding the terms clear and unambiguous and holding that the exclusion is not limited to traditional environmental pollution. *See, e.g., Am. States Ins. Co. v. Nethery,* 79 F.3d 473, 475–78 (5th Cir.1996) (applying Mississippi law); *U.S. Fire Ins. Co. v. City of Warren,* 176 F.Supp.2d 728, 733

---

**2.** The courts are almost evenly split regarding the interpretation of the absolute pollution exclusion, with a slim majority of jurisdictions limiting the exclusion to situations involving traditional environmental pollution. *See* Jeffrey W. Stempel, *Stempel on Insurance Contracts* § 14.11[C] (3rd ed.2006).

(E.D.Mich.2001); *Toledo v. Van Waters & Rogers, Inc.*, 92 F.Supp.2d 44, 51–52 (D.R.I.2000); *Shalimar Contractors, Inc. v. Am. States Ins. Co.*, 975 F.Supp. 1450, 1456–57 (M.D.Ala.1997); *Pa. Nat'l Mut. Cas. Ins. Co. v. Triangle Paving, Inc.*, 973 F.Supp. 560, 563–66 (E.D.N.C.1996); *Brown v. Am. Motorists Ins. Co.*, 930 F.Supp. 207, 208–09 (E.D.Pa.1996); *W. Am. Ins. Co. v. Band & Desenberg*, 925 F.Supp. 758, 761–62 (M.D.Fla.1996).

Midwest argues that under the plain-meaning approach to interpreting policy language as set forth in our *Board of Regents* decision, carbon monoxide is clearly a pollutant to which the absolute pollution exclusion applies. Appellants, on the other hand, argue that we should adopt the majority view because the definition of "pollutants" is ambiguous in the context of this case and contradicts the policyholder's reasonable expectations.

■ When reviewing an appeal from summary judgment, we determine whether any genuine issues of material fact exist and whether the district court erred in applying the law. *Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). Because the facts are undisputed here, we decide whether either party is entitled to judgment as a matter of law. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993).

■ "The interpretation of an insurance policy, including the question of whether a legal duty to defend or indemnify arises, is one of law which this court reviews de novo." *Auto–Owners Ins. Co. v. Todd*, 547 N.W.2d 696, 698 (Minn.1996). "While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn.2006). "[O]nce the insurer shows the application of an exclusion clause, the burden of proof

shifts back to the insured because the exception to the exclusion 'restores' coverage for which the insured bears the burden of proof." *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 314 (Minn.1995), *rev'd on other grounds, Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn.2009).

■ We interpret insurance policies using the general principles of contract law. *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 879 (Minn.2002). "In interpreting insurance contracts, we must ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring contract." *Jenoff, Inc. v. N.H. Ins. Co.*, 558 N.W.2d 260, 262 (Minn.1997). An insurance policy "must be construed as a whole, and unambiguous language must be given its plain and ordinary meaning." *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn.1986). "Provisions in an insurance policy are to be interpreted according to both 'plain, ordinary sense' and 'what a reasonable person in the position of the insured would have understood the words to mean.'" *Farmers Home Mut. Ins. Co. v. Lill*, 332 N.W.2d 635, 637 (Minn.1983) (quoting *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn.1977)). Language in a policy is ambiguous if it is susceptible to two or more reasonable interpretations. *Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn.1997). "Any ambiguity is resolved in favor of the insured...." *Prahm v. Rupp Const. Co.*, 277 N.W.2d 389, 390 (Minn.1979).

### A.

■ In urging us to adopt the majority view, appellants first argue that the definition of "pollutants" is ambiguous in the context of this case. We disagree. Applying the plain-meaning approach of· our

*Board of Regents* decision, we hold that carbon monoxide released from a negligently installed boiler is clearly a "pollutant" that is subject to the absolute pollution exclusion of the Midwest policy.

We have taken a "non-technical, plain-meaning approach" to interpreting pollution exclusions, as established in our *Board of Regents* decision. *See Hanson*, 588 N.W.2d at 779. In *Board of Regents*, we held that asbestos fibers were "irritants" under the qualified pollution exception,[3] despite the fact that asbestos was a naturally occurring mineral rather than the by-product of industrial pollution or a waste material. 517 N.W.2d at 892. We noted that the pollution exclusion excluded coverage of "irritants" and "contaminants" and concluded that "we would be doing a disservice to the English language if we were to say that asbestos fibers, which are a health hazard because of their irritant effects on the human body, were not an irritant." *Id.*

Using the plain-meaning approach established in *Board of Regents*, carbon monoxide not only qualifies as a "pollutant" under the Midwest policy, but the appellants admit it is a pollutant. The definition of "pollutant" in the Midwest policy includes "any ... gaseous ... pollutant, irritant or contaminant." The federal government classifies carbon monoxide as a pollutant and regulates its concentration under the Clean Air Act. 40 C.F.R. § 50.8 (2012). The Minnesota Pollution Control Agency classifies carbon monoxide as a "criteria pollutant" that it actively regulates. Minn. R. 7005.0100, subp. 8(a) (2011). While there may be substances that are difficult to establish as "pollutants" for purposes of the absolute pollution exclusion, carbon monoxide is not one of them. It is enough for purposes of the present dispute to conclude that carbon monoxide is a pollutant under the terms of the absolute pollution exclusion; there are serious concerns associated with the breadth of the exclusion that we leave for another day, and we do not attempt to define the complete scope of the term "pollutant" in the absolute pollution exclusion. Instead, we only conclude that, based on our holding in *Board of Regents*, carbon monoxide qualifies as a pollutant in this case.

Carbon monoxide is also an "irritant" under the Midwest policy. *Merriam–Webster's Collegiate Dictionary* 171 (10th ed.2001) defines carbon monoxide as "a colorless odorless very toxic gas." Here, carbon monoxide was discharged or released into the air, causing physical irritation to appellants.

We also conclude that the pollution exclusion of the Midwest policy applies to the release of carbon monoxide indoors. In *Board of Regents*, we distinguished the terms "atmosphere" from "air," 517 N.W.2d at 892–93, and concluded that the qualified pollution exclusion that excluded coverage for damages "arising out of the discharge, dispersal, release or escape of

---

**3.** Beginning in 1970, insurers began adding a "qualified pollution exclusion" to the standard contractors general liability policy that excluded coverage for damage arising out of "the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water." Stempel, *supra* § 14.11[M]. This clause contained an exception for discharges that were "sudden and accidental." *Id.* In the mid–1980s, insurance companies adopted a new version of the pollution exclusion which became known as the "absolute" pollution exclusion clause. *See Koloms*, 687 N.E.2d at 81. This new version eliminated the "sudden and accidental" exception and the requirement that the discharge be "into or upon land, the atmosphere or any water course." Stempel, *supra*, § 14.11[C].

... irritants, contaminants or pollutants into or upon land, the atmosphere, or any water course or body of water," *id.* at 890, did not exclude coverage for the release of asbestos fibers inside a building but that the excess policy that excluded coverage for "contamination or pollution of land, water, air, or real or personal property" did bar coverage, *id.* at 893–94. We reasoned that although "atmosphere" refers to the "air surrounding our planet," the term "air" is not limited to the natural environment only and encompasses the "contamination or pollution by asbestos fibers of air within a building." *Id.* at 892–93. Since the pollution exclusion in the Midwest policy does not "use language descriptive of the natural environment only," such as "atmosphere" or "watercourse," the exclusion applies to indoor carbon monoxide. *Id.* at 893–94 (holding that when a policy does not use language such as "atmosphere" or "watercourse" that only refers to the natural environment, the exclusion encompasses pollution of the air within a building).

Applying the plain-meaning approach of our *Board of Regents* decision, we hold that carbon monoxide released from a negligently installed boiler is a "pollutant" that is subject to the absolute pollution exclusion of the Midwest policy.

Two arguments about the underlying public policy issues are worth discussing here. First, there is little doubt that the results here are regrettably harsh—the homeowners suffered serious injuries, and it is undisputed that those injuries resulted from the negligent installation of the boiler. That said, as attractive as it might be to use the "traditional environmental pollution" definition as a route to compensation for the injured parties, that formulation has its own risks and complications. Appellants do not propose a definition of "traditional environmental pollution" ex- cept to assure our court that such a phrase would not include carbon monoxide. Further, there is significant pressure on the executive and legislative branches of government to expand the definition of what constitutes "pollution," traditional or otherwise. The likely result of adopting the formulation urged by appellants would be inconsistency in determining when the absolute exclusion applies. Second, the place to settle the public policy issues underlying this exclusion is in the marketplace or by legislative action.

### B.

Appellants also urge us to adopt the majority view on the basis that a reasonable policyholder in Wolters's position would not have understood the absolute pollution exclusion to preclude coverage in this circumstance. We reject appellants' claim and hold, consistent with precedent, that the "reasonable expectations" test does not apply here. In *Board of Regents,* we held that the "reasonable expectations" test did not apply where the pollution exclusion was plainly designated as an exclusion:

> [In *Grinnell Mutual Reinsurance Co. v. Wasmuth* ] [t]he court of appeals found insurance coverage, holding that an insured would not reasonably have expected its comprehensive general liability policy to exclude coverage for "unexpected damage due to installation of building materials in a home." [432 N.W.2d 495, 499 (Minn.App.1989).] The reasonable expectations test of *Atwater Creamery Co. v. Western National Mutual Insurance Co.,* 366 N.W.2d 271 (Minn.1985), however, has no place here, and the contrary ruling of *Grinnell* is overruled. In *Atwater,* we held that "where major exclusions are hidden in the definitions section, the insured should be held only to reasonable knowledge of the literal terms and conditions." 366 N.W.2d at 278. In the comprehen-

sive general liability policy involved in this case, the pollution exclusion is plainly designated as such.

*Id.* at 891 (footnote omitted). Here, the pollution exclusion was plainly designated as an exclusion, since it was located underneath the heading "EXCLUSIONS THAT APPLY TO ALL LIABILITY COVERAGES." The reasonable expectations doctrine, therefore, does not apply to this case.[4]

Affirmed.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

STRAS, Justice (concurring in part, dissenting in part).

I join the court's opinion, except its decision to review the appellants' "reasonable expectations" argument in the interest of justice. *See* Minn. R. Civ.App. P. 103.04 ("The appellate courts may reverse, affirm or modify the judgment or order appealed from or take any other action as the interest of justice may require."). ·The court claims that there is an inextricable relationship between the proper interpretation of the absolute pollution exclusion and an insured's "reasonable expectations" about the scope of coverage of a commercial general liability insurance policy. The court, however, does not discuss—much less rely on—the appellants' reasonable expectations in concluding that carbon monoxide is a "pollutant" under the plain language of the absolute pollution exclusion. To the contrary, the court summarily holds, based on *Board of Regents of the University of Minnesota v. Royal Insurance Company of America,* 517 N.W.2d 888 (Minn.1994), that the "reasonable expectations" doctrine does not apply as a matter of law when a pollution exclusion is "plainly designated" as an exclusion. *See supra* at 2. Under these circumstances, I see no reason to depart from our general rule that we do not review issues that the parties raise for the first time before this court. *See Broehm v. Mayo Clinic Rochester,* 690 N.W.2d 721, 728 (Minn.2005).

PAGE, Justice (dissenting).

I respectfully dissent because I believe the district court was correct when it concluded that, on these facts, the pollution exclusion does not bar recovery.

ANDERSON, Justice Paul H. (dissenting).

I respectfully dissent. I disagree with the majority's conclusion that carbon mo-

---

**4.** The reasonable expectations doctrine has a very narrow application. *Atwater Creamery Co. v. Western National Mutual Insurance Co.,* 366 N.W.2d 271 (Minn.1985), presented a unique situation. Under the policy definition at issue in that case, there was no "burglary" on the insured's premises, even though admittedly a burglary had occurred and even though the policy was a "Mercantile Open Stock Burglary Policy." *Id.* at 274–75. For there to be a burglary, the policy definition required that there be a burglar who left visible marks of a forcible entry or exit. If the burglar was skillful enough to leave no marks, there was no "burglary." This "visible marks" qualification, we said in *Atwater,* was really a "hidden" or masked exclusion, impermissibly disguised within the definition section of the policy. *Id.* at 276–78. In rejecting the application of the reasonable expectations doctrine to the pollution exclusion at issue in *Board of Regents,* we concluded:

> In the comprehensive general liability policy involved in this case, the pollution exclusion is plainly designated as such; consequently, the wording of the exclusion should be construed, if a claim of ambiguity is raised, in accordance with the usual rules of interpretation governing insurance contracts. The reasonable expectation test is not a license to ignore the pollution exclusion in this case nor to rewrite the exclusion solely to conform to a result that the insured might prefer.

517 N.W.2d at 891.

noxide released from the negligently installed boiler in the home of appellants Charles E. Bartz and Catherine M. Brewster is a "pollutant" under the plain language of the pollution exclusion in respondent Michael D. Wolters's general liability insurance policy with Midwest Family Mutual Insurance Company. I conclude that the pollution exclusion at issue is ambiguous when applied to the claims of Bartz and Brewster because it is reasonable to interpret the exclusion as applying only to traditional environmental pollution. Accordingly, I would hold that the Beltrami County District Court got it right when it found that the pollution exclusion in the Midwest policy does not exclude coverage for injuries caused by carbon monoxide. Therefore, I would reverse the court of appeals.

Charles Bartz and Catherine Brewster each claim that Michael Wolters: (1) negligently connected the boiler to a propane fuel source despite the manufacturer's warning to the contrary; (2) failed to inspect the work of the subcontractor who installed the boiler; and (3) failed to convert the boiler to operate on propane. The majority concludes that Bartz's and Brewster's claims are not covered under the Midwest policy carried by their contractor, Wolters, because of a provision in the policy that excludes coverage for damages for bodily injury "arising wholly or partially out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants." It is on this key point that I disagree with the majority.

Insurance policies are contracts, and general principles of contract law apply to their interpretation absent statutory provisions to the contrary. *Goodyear Tire & Rubber Co. v. Dynamic Air, Inc.*, 702 N.W.2d 237, 244 (Minn.2005). We construe the terms of an insurance policy "according to what a reasonable person in the position of the insured would have understood the words to mean." *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn.1977). In doing so, we interpret exclusions narrowly. *American Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn.2001). While unambiguous language in an insurance policy must be given its "plain, ordinary, and popular meaning," we construe ambiguous language in an insurance policy against the insurer. *Gen. Cas. Co. of Wisc. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 575 (2009) (citation omitted) (internal quotation marks omitted). Language in an insurance policy is ambiguous if it is reasonably susceptible to more than one interpretation. *Am. Commerce Ins. Brokers, Inc. v. Minn. Mut. Fire & Cas. Co.*, 551 N.W.2d 224, 227 (Minn.1996). Significantly, a word or phrase in an insurance policy may be ambiguous in one context but unambiguous in another context. *See Bd. of Regents of Univ. of Minn. v. Royal Ins. Co. of Am.*, 517 N.W.2d 888, 892 (Minn.1994).

It is undisputed that, in the absence of an applicable exclusion, the claims of Bartz and Brewster would be covered under the Midwest policy and Midwest Family would be obligated to defend Wolters against those claims.[1] Thus, the primary issue before us is whether the claims asserted by Bartz and Brewster are unambiguously excluded from coverage under the language of the pollution exclusion in the

---

1. The policy requires Midwest Family to "pay all sums which an **insured** becomes legally obligated to pay as damages due to **bodily injury** or **property damage** arising out of the **Products/Completed Work Hazard** to which this insurance applies." The claims of Bartz and Brewster are covered under this provision because Bartz and Brewster both allege bodily injury arising out of the work performed by Wolters or on Wolters's behalf by subcontractors.

Midwest policy. The pollution exclusion provides, in relevant part: ...

9. **We** do not pay for **bodily injury or property damage:**

   a. arising wholly or partially out of the actual, alleged or threatened discharge, dispersal, release or escape of **pollutants:**

   * * * *

   4) at or from any premises where **you** or any contractor or subcontractor, directly or indirectly under **your** control, are working or have completed work:

   a) if the **pollutant** is on the premises in connection with such work, unless the **bodily injury** or **property damages** arise from the heat, smoke or fumes of a fire which becomes uncontrollable or breaks out from where it was intended to be; or

   b) if the work in any way involves testing, monitoring, clean-up, containing, treating or removal of **pollutants.**

"Pollutant" is defined in the policy to include "any solid, liquid, gaseous, thermal, electrical emission (visible or invisible) or sound emission pollutant, irritant or contaminant."

The majority concludes that, under a "non-technical, plain-meaning approach," carbon monoxide released from a negligently installed boiler is unambiguously a "pollutant" that is subject to the pollution exclusion in the Midwest policy. I disagree. I reach this different conclusion in light of the purposes for which the pollution exclusion was adopted, and because our court's longstanding case law requires us to construe words of exclusion in an insurance policy narrowly. Unlike the majority, I conclude that the question of whether the indoor release of carbon monoxide from a negligently installed boiler

is a "pollutant" within the meaning of the Midwest policy is susceptible to more than one reasonable interpretation.

I reach this conclusion by considering the genesis of the pollution exclusion. It is a bedrock principle of contract interpretation that our court's primary goal is to "determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.,* 666 N.W.2d 320, 323 (Minn.2003). We ascertain the intent of the contracting parties "not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning *in accordance with the obvious purpose of the insurance contract as a whole.*" *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.,* 256 Minn. 404, 426, 98 N.W.2d 280, 295 (1959) (emphasis added). Accordingly, we must consider the "obvious purpose" of the pollution exclusion in order to determine whether the exclusion applies to preclude coverage. *Id.*

The events that "led the insurance industry to adopt the standard pollution-exclusion clause are well-documented and relatively uncontroverted." *Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am.,* 134 N.J. 1, 629 A.2d 831, 848 (1993). The insurance industry adopted the pollution exclusion in response to one primary concern: "avoidance of the enormous expense from ... *environmental* litigation." *Am. States Ins. Co. v. Koloms,* 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 81 (1997) (citation omitted) (internal quotation marks omitted). More specifically, the pollution exclusion was "designed to bar coverage for gradual environmental degradation of any type and to preclude coverage responsibility for government-mandated cleanup such as Superfund, which was enacted in 1980." Jeffrey W. Stempel, *Reason and Pollution: Correctly Constru-*

*ing the "Absolute" Exclusion in Context and in Accord with its Purpose and Party Expectations,* 34 Tort & Ins. L.J. 1, 5 (1998).

The pollution exclusion was not designed to preclude coverage for torts only because they happen to involve a "pollutant." *E.g., W. Alliance Ins. Co. v. Gill,* 426 Mass. 115, 686 N.E.2d 997, 998–99 (1997). This misunderstanding of the "obvious purpose" of the pollution exclusion is the fatal defect in the majority's "non-technical, plain-meaning approach." The pollution exclusion in the Midwest Policy "cannot be read literally as it would negate virtually all coverage." *Am. States Ins. Co. v. Kiger,* 662 N.E.2d 945, 948 (Ind.1996). Indeed, as Judge Richard Posner, writing for a unanimous panel of the Seventh Circuit, recently observed: "a literal reading of the pollution exclusion would exclude coverage for acts remote from the ordinary understanding of pollution harms and unrelated to the concerns that gave rise to the exclusion." *Scottsdale Indem. Co. v. Vil. of Crestwood,* 673 F.3d 715, 717 (7th Cir.2012). Judge Posner and the Seventh Circuit specifically cited a case involving a furnace that leaked carbon monoxide and injured several workers in the building that contained the furnace as an example of the type of harm "unrelated to the concerns that gave rise to the exclusion." *Id.* (citing *Koloms,* 687 N.E.2d at 82). Judge Posner and the Seventh Circuit would sensibly limit the exclusion to "pollution harms as ordinarily understood," because it would be "a misuse of language ... to say that the workers [in *Koloms* ] had been injured by pollution." *Id.* Judge Posner and the Seventh Circuit concluded with a rhetorical question that drives the point home: "If one commits suicide by breathing in exhaust fumes, is that death by pollution?" *Id.*

I would conclude that the answer to Judge Posner's question is "no." Similarly, if a person suffers an injury from the indoor release of carbon monoxide from a negligently installed boiler, I would conclude that the injury is not from "pollution." The majority disagrees with that interpretation. But the key point is that *both* interpretations of the pollution exclusion are reasonable. Indeed, "a reasonable person in the position of the insured" could have understood the pollution exclusion to be applicable only to traditional environmental pollution, and therefore inapplicable to the indoor release of carbon monoxide from a negligently installed boiler.[2] *Canadian Universal Ins. Co.,* 258 N.W.2d at 572; *see also Stoney Run Co. v. Prudential–LMI Commercial Ins. Co.,* 47 F.3d 34, 38 (2d Cir.1995) (holding that "a reasonable interpretation of the pollution exclusion clause is that it applies only to environmental pollution, and not to all contact with substances that can be classified as pollutants"). Given this reasonable interpretation of the policy's language, I conclude that the pollution exclusion clause incorporated into the Midwest policy is ambiguous as applied to the Bartz and Brewster claims.

It was reasonable for Wolters to believe that he had purchased insurance coverage for any carbon monoxide poisoning that may result from his negligent installation of the propane-fueled boiler that was purchased by Bartz. As previously noted, ambiguous words in an insurance policy— especially ambiguous words in an exclusionary clause—are to be construed

**2.** To be clear, my interpretation is not based on the "reasonable expectations doctrine." As the majority points out, the "reasonable expectations doctrine" is distinct from our longstanding principle that we construe the terms of an insurance policy "according to what a reasonable person in the position of the insured would have understood the words to mean." *Canadian Universal Ins. Co.,* 258 N.W.2d 570 at 572.

against the insurer. *Wozniak Travel,* 762 N.W.2d at 575. Under our long-standing canons of construction, the Midwest policy must be construed against the insurer, and when the policy is construed narrowly, the type of injury suffered by Bartz and Brewster falls outside the pollution exclusion.

The majority asserts that "[w]hile there may be substances that are difficult to establish as 'pollutants' for purposes of the pollution exclusion, carbon monoxide is not one of them." *Supra* at 16. I am doubtful about this assertion: courts that have considered the specific issue of whether the pollution exclusion bars coverage of negligence claims arising from carbon monoxide poisoning are about evenly split.[3] Moreover, beyond the relatively rare context of carbon monoxide poisoning, the majority acknowledges that a "non-technical, plain-meaning" approach to the pollution exclusion is the *minority* view among jurisdictions to consider the question. That point alone counsels in favor of finding ambiguity. *See Minn. Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175, 180 (Minn.1990) (explaining that the "ambiguity inherent" in a term of an insurance policy was "exemplified by the sharp division in case authority from other jurisdictions"); *see also* 22 Britton D. Weimer et al., *Minnesota Practice—Insurance Law and Practice* § 2.3 (2d ed.2010) (noting that one factor to consider in determining whether a provision of an insurance policy is ambiguous is whether a term has received contradictory interpretations in other jurisdictions). At the very least, the irrefutable fragmentation of authority on the scope of the pollution exclusion weighs heavily in favor of concluding that the language in the pollution exclusion is susceptible of more than one *reasonable* interpretation. Indeed, unless the majority views the weight of authority limiting the pollution exclusion to traditional environmental pollution as inherently *unreasonable,* I find it difficult to understand how the majority can conclude that the policy is unambiguous on the facts of this case.

For all of the foregoing reasons, I conclude that the exclusion in Midwest Family's insurance policy for bodily injury arising from "pollutants" does not encompass elevated levels of carbon monoxide in a single-family residence caused by the negligent installation of a boiler. Therefore, I would reverse the court of appeals and affirm the district court.

---

3. *See, e.g., Koloms,* 687 N.E.2d at 79–82 (concluding that pollution exclusion was limited to traditional environmental pollutants based on drafting history and retention of environmental terms of art and did not apply to carbon monoxide); *Kiger,* 662 N.E.2d at 948–49 (finding ambiguity based on expansive scope of exclusion and construing against drafter); *Doerr v. Mobil Oil Corp.,* 774 So.2d 119, 126–28, 135 (La.2000) (finding ambiguity and limiting exclusion to traditional environmental pollution based on history of provision); *Gill,* 686 N.E.2d at 999–1000 (limiting exclusion to traditional environmental pollutants); *Andersen v. Highland House Co.,* 93 Ohio St.3d 547, 757 N.E.2d 329, 334 (2001) (holding that carbon monoxide from residential space heater was not "pollution" so as to be excluded by pollution exclusion). *But see, e.g., Nautilus Ins. Co. v. Country Oaks Apartments Ltd.,* 566 F.3d 452, 455–56 (5th Cir. 2009) (applying Texas law to bar coverage under pollution exclusion for carbon monoxide release from furnace); *Bituminous Cas. Corp. v. Sand Livestock Sys., Inc.,* 728 N.W.2d 216, 221–22 (Iowa 2007) (concluding that carbon monoxide released from power washer was pollutant subject to pollution exclusion); *Reed v. Auto–Owners Ins. Co.,* 284 Ga. 286, 667 S.E.2d 90, 92 (2008) (concluding that carbon monoxide release inside rental house was pollutant subject to pollution exclusion).