# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-2404

_____

Tile Shop Holdings, Inc.

*Plaintiff - Appellant*

v.

Allied World National Assurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: June 17, 2020
Filed: December 7, 2020

_____

Before KELLY, ERICKSON, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

After Tile Shop Holdings, Inc. settled multiple lawsuits with its shareholders, it sought indemnification under its directors-and-officers insurance policies. Its excess insurer, Allied World National Assurance Company, denied coverage. Tile

Shop sued, but the district court[1] granted Allied's motion for summary judgment. We affirm.

I.

Founder Robert Rucker started Tile Shop in 1984. The company, which operates a chain of retail tile stores, was privately owned until 2012, when Rucker decided to take the company public. The reason for the move was the potential for "a national presence."

As relevant here, the move created a new company, Tile Shop Holdings, Inc., which filed a series of documents with the Securities and Exchange Commission, including a registration statement in June 2012, several amendments in July, and a prospectus in early August. Those filings never mentioned certain related-party transactions. *See* 17 C.F.R. § 229.404(a). Specifically, Tile Shop had obtained millions of dollars in supplies from Chinese export companies owned and operated in substantial part by Rucker's brother-in-law. *Id.* (explaining that related-party transactions include dealings with an "immediate family member of a director or executive officer").

About 15 months after Tile Shop went public, an investment-research firm reported that Tile Shop had failed to disclose the related-party transactions in its SEC filings. The report stated that Tile Shop "secretly control[led] its largest supplier" and had "use[d] this dubious entity to report fictitious margins." In one explosive passage, the report made comparisons to the schemes run by "Bernie Madoff and Allen Stanford[]," and explained that "Tile Shop's gross margins [we]re too good to be true." Shareholders were advised to "sell . . . immediately."

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

-2-

The report spelled trouble for the company. Tile Shop's alleged misconduct led to two types of lawsuits. The first were shareholder class-action lawsuits under the Securities Act of 1933 and Securities Exchange Act of 1934. *See* 15 U.S.C. §§ 77a, *et seq.*, 78a, *et seq.*; 17 C.F.R. § 240.10b-5; Consolidated Am. Compl. at ¶¶ 1, 4–5, *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, No. 0:14-cv-00786-ADM-TNL (D. Minn. May 23, 2014), ECF No. 66. The second were derivative suits against the company's officers and directors for breaches of fiduciary duty and unjust enrichment. *See* Verified Consolidated Stockholder Derivative Compl. at ¶ 1, *In re Tile Shop Holdings, Inc. Stockholder Derivative Litig.*, No. 10884-VCG (Del. Ch. July 31, 2015). Both sets of lawsuits eventually settled.

To recover some of what it had lost, Tile Shop sought benefits under its directors-and-officers policies. American International Group, Inc., more commonly known as AIG, was its primary insurer, but Tile Shop's claims exceeded the policy limit of $10 million. So Tile Shop turned to Allied, its excess insurer, which denied coverage. The reason was a policy exclusion for wrongful prior acts.

Not satisfied with Allied's reason for denying benefits, Tile Shop sought declaratory relief and damages in federal district court. The court, on a motion for summary judgment, reached the same conclusion that Allied had: the losses were nonrecoverable under a policy exclusion.

II.

Minnesota courts use a two-step burden-shifting framework when evaluating insurance-coverage questions. At the first step, Tile Shop must prove that the policy's insuring clause covers its losses. *See Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013). Only then, at the second step, does the burden shift to Allied to prove that an exclusion applies. *See id.* "At both of these steps, our review is de novo, and we must give the policy, including individual

terms and exclusions, its plain and ordinary meaning." *Westfield Ins. Co. v. Miller Architects & Builders*, 949 F.3d 403, 405 (8th Cir. 2020) (internal citations omitted) (applying Minnesota law).

The second step is the focus here. Allied concedes that Tile Shop has shown that its losses are covered under the policy's insuring clause. The disagreement is about whether they fall within an exclusion.

A.

Tile Shop's excess policy contains what is called a "follow-form clause," which subjects it to the terms and conditions of the primary policy. *See Rausch v. Beech Aircraft Corp.*, 277 N.W.2d 645, 646 (Minn. 1979) ("A 'follow[-]form endorsement' is designed to 'track' or provide the same coverage as a separate underlying policy."). The idea is to limit risk for the excess insurer by covering the same basic risks as the primary insurer, even if the excess policy contains some of its own unique terms and conditions. *See* 4 Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition § 24.02, at 24-11 (2018) (explaining that follow-form clauses "contribute to uniform coverage and the spreading of risk among the insurers").

Here, the spotlight is on the interaction between the follow-form clause and the primary policy's prior-acts exclusion, which eliminates coverage for certain wrongful acts committed *before* the policy went into effect. The question is whether this exclusion has been made a part of the excess policy through its follow-form clause.

The follow-form clause in this case is fairly typical. *See* 4 Thomas, *supra*, § 24.02, at 24-10. "Except as [t]herein stated," the excess policy "is subject to all terms, conditions, agreements and limitations of the Primary Policy." The default, in other words, is that "all terms" and "limitations" in the primary policy, including any exclusions, are part of the excess policy, as if they had been copied and pasted

-4-

directly into the document. *See id.* ("A [follow-form clause] incorporates by reference the terms, conditions[,] and *exclusions* of the underlying policy." (emphasis added)); *cf. Halbach v. Great-West Life & Annuity Ins. Co.*, 561 F.3d 872, 876 (8th Cir. 2009) ("Basic contract principles instruct that where a writing refers to another document, . . . the portion to which reference is made[] becomes constructively a part of the writing . . . ." (internal quotation marks and brackets omitted)).

B.

The relevant exclusions here deal with "prior acts." The first prior-acts exclusion explains that

> the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** alleging any **Wrongful Act** occurring prior to *August 20, 2012* or after the end of the **Policy Period**. This policy only provides coverage for **Wrongful Acts** occurring on or after *August 20, 2012* . . . . **Loss** arising out of the same or related **Wrongful Act** shall be deemed to arise from the first such same or related **Wrongful Act**.

Of key importance here is the last sentence—what we will call the relation-back clause. It treats certain wrongful acts occurring after August 20, 2012, the policy's retroactive date, as if they happened earlier. Losses are excluded from coverage if the underlying wrongful act occurred "prior to August 20, 2012," or is "the same [as] or related [to]" a pre-August-20 act. Wrongful acts can, in other words, relate back to an earlier date.

The second prior-acts exclusion appears in the excess policy itself. It says that

> [the] Policy shall not cover any Loss in connection with any claim alleging, arising out of, based upon, or attributable to any wrongful act(s) committed, attempted, or allegedly committed or attempted prior

to August 20, 2012. This Policy shall provide coverage only with respect to wrongful acts occurring on or after August 20, 2012 . . . .

The dispute is over whether the second prior-acts exclusion is a supplement or replacement for the first. Allied's position is that its own prior-acts exclusion adds to the one in the primary policy.[2] Tile Shop, by contrast, believes the second one substitutes for the first, leaving the excess policy without a relation-back clause.

The excess policy's plain language leads to the conclusion that the supplemental reading is correct. *See Westfield Ins. Co.*, 949 F.3d at 405 (noting that we give "terms and exclusions" in insurance policies their "plain and ordinary meaning"). The first clue is the follow-form clause, which incorporates "all terms . . . and limitations," "except as [t]herein stated." Nothing in the excess policy suggests, much less "state[s]," that the second prior-acts exclusion displaces the first.

---

[2]The combined prior-acts exclusion would look something like this:

**[FIRST] PRIOR[-]ACTS EXCLUSION**
. . . [T]he **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** alleging any **Wrongful Act** occurring prior to *August 20, 2012* or after the end of the **Policy Period**. This policy only provides coverage for **Wrongful Acts** occurring on or after *August 20, 2012 . . . .* **Loss** arising out of the same or related **Wrongful Act** shall be deemed to arise from the first such same or related **Wrongful Act**.

**[SECOND] PRIOR[-]ACTS EXCLUSION**
This Policy shall not cover any Loss in connection with any claim alleging, arising out of, based upon, or attributable to any wrongful act(s) committed, attempted, or allegedly committed or attempted prior to August 20, 2012. This Policy shall provide coverage only with respect to wrongful acts occurring on or after August 20, 2012 . . . .

The second clue is the endorsement adding the second prior-acts exclusion. *See Indep. Sch. Dist. 833 v. Bor-Son Constr., Inc.*, 631 N.W.2d 437, 441 (Minn. Ct. App. 2001) ("[A]n endorsement is an amendment to an insurance policy." (internal quotation marks and brackets omitted)).  By its own terms, it "amend[s]" the policy "by *adding*" the second prior-acts exclusion.  (Emphasis added).  Contrast this language with another endorsement from the same policy, which contained an instruction to "delete[]" a clause "and replace[] [it] with the following," and the only reasonable reading is that the second prior-acts exclusion was an addition, not a replacement.  *See Storms, Inc. v. Mathy Constr. Co.*, 883 N.W.2d 772, 776 (Minn. 2016) ("We construe a contract as a whole and attempt to harmonize all of its clauses.").  So Allied is neither liable for the losses from the prior acts it has excluded in its own policy nor those excluded under the primary policy.

## C.

Having determined that the excess policy combines the prior-acts exclusions from both policies, the issue is whether Allied's denial of coverage falls under either one.  In other words, is Allied on the hook for some of the money that Tile Shop spent in defending and settling the class actions and the derivative suits?

We conclude that the answer is no under the first prior-acts exclusion.  There is little doubt that the "[l]oss[es]" were "connect[ed]" to "[c]laim[s]" against Tile Shop.  Indeed, the underlying complaints alleged "[w]rongful [a]cts" by the company, including "critical omissions," "conceal[ment]," misleading "representations," "breaches of fiduciary duties," and violations of SEC regulations. Compl. at ¶¶ 118–19, *Beaver Cnty. Emps.' Ret. Fund*; Compl. at ¶¶ 1–2, *In re Tile Shop Holdings, Inc.*

These allegedly wrongful acts also occurred "prior to" August 20, 2012 or were the "same" as or "related" to pre-August-20 acts.  An example is the allegation that "Tile Shop failed to disclose its related-party transactions" and gave "false and misleading" explanations for its "high margins," including in post-August-20 filings

like its Form 10-Q.[3]  Compl. at ¶¶ 118, 126–27, *Beaver Cnty. Emps.' Ret. Fund*.  As it turns out, this "same" information was also absent from Tile Shop's June, July, and early August 2012 filings.  The bottom line is that Tile Shop's wrongful acts started well before August 20, which made any "[l]oss[es]" from them excludable under the relation-back clause.

## III.

We accordingly affirm the judgment of the district court.

_____

---

[3]Tile Shop argues that under *Zimmerman v. Safeco Ins. Co. of Am.*, "the appropriate focus [is] on the liability-creating conduct"—here, the post-August-20 legal violations for which the plaintiffs in the securities actions sought relief.  605 N.W.2d 727, 731 (Minn. 2000).  *Zimmerman* is not on point, however, because it involved the interpretation of a business-pursuits exclusion, not a prior-acts exclusion.  *Id.* at 729–30.